# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| MARQUETTA MILLER, *et al.*, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 17-cv-0840 (KBJ) |
| D.C. WATER AND SEWER AUTHORITY, *et al.*, | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

The 21 plaintiffs in the instant action are neighbors who had the distinct misfortune of living on Delafield Place in the District of Columbia—a street containing mostly single-family residences in the Northeast quadrant of the city—on November 18, 2016. On that date, "more than two feet of raw sewage, including sanitary, semi-industrial, and commercial waste from a nearby nursing home, hospital, and several retail operations, flooded into Plaintiffs' homes[.]" (Am. Compl., ECF No. 9, ¶ 1.) Plaintiffs have sued the District of Columbia Water and Sewer Authority ("WASA") and three remediation companies that WASA hired to clean up and remediate the damage (collectively, "Defendants"); their complaint makes ten claims that can be grouped into three categories. Generally speaking, Plaintiffs allege that this disastrous occurrence and its unsatisfactory aftermath (1) constituted civil rights violations under federal and state law (Counts I–IV); (2) breached various federal and state environmental protection statutes (Counts V–VIII); and (3) amounted to gross

negligence and trespass under D.C. common law (Counts IX and X). Plaintiffs seek compensatory and punitive damages, attorneys fees and costs, and an order requiring Defendants to "address the injuries that Defendants caused on Delafield Place, including by arranging for and paying the medical monitoring of the citizens affected by Defendants' conduct[.]" (Am. Compl., at 45.)[1]

Before this Court at present are the four separate motions to dismiss that Defendants have filed in this matter. (*See* Def. WASA's Mot. to Dismiss Pl.'s Am. Compl. ("WASA's Mot."), ECF No. 19; Mot. by Def. Charmay, Inc., d/b/a ServiceMaster NCR, to Dismiss Am. Compl. Relating to 129 Delafield Place ("ServiceMaster's Mot."), ECF No. 23; Belfor USA Group Inc.'s Mot. to Dismiss the Am. Compl. ("Belfor's Mot."), ECF No. 26; Def. Superior Mitigation Servs. Inc. d/b/a Servpro of Washington, DC's Rule 12(b)(6) Mot. to Dismiss ("Servpro's Mot."), ECF No. 27.)[2] In the main and taken together, Defendants' motions argue that Plaintiffs failed to comply with the notice requirements of the environmental statutes they invoked—statutes which do not apply to the factual circumstances here in any event; that Plaintiffs have failed to allege sufficiently that Defendants acted under color of state law or had the requisite discriminatory intent for the purpose of Plaintiffs' civil rights claims; and that the facts alleged in the complaint contradict Plaintiffs' common-law tort claims, which are also barred by various immunity doctrines. In opposition, Plaintiffs insist that they provided sufficient notice of their claims to WASA under

---

[1] Page numbers herein refer to those that the Court's electronic case-filing system automatically assigns.

[2] For the purpose of this Memorandum Opinion, and unless otherwise noted, the arguments that Defendants make in their separate motions are viewed collectively, although separate citations are provided.

environmental statutes that apply to the sewage release at issue here and provide the purely injunctive relief they seek; that Plaintiffs' status as a uniformly African-American community raises a sufficient inference of discriminatory intent to raise civil rights claims; and that the immunity doctrines that Defendants allege do not insulate Defendants from the Plaintiffs' common-law tort claims, which Plaintiffs say have been alleged sufficiently. (*See* Pls.' Mem. in Opp'n to Defs.' Mots. To Dismiss Am. Compl. ("Pls.' Opp'n"), ECF No. 38, at 10–27.)

For the reasons explained below, this Court concludes that Plaintiffs have failed to comply with the procedural requirements of the environmental statutes they invoke, and that the facts alleged in the complaint do not state a claim for relief under the statutes. Plaintiffs have also fallen far short of making plausible allegations of federal civil rights violations, because the complaint contains insufficient facts to establish either that Defendants acted under color of state law or that their conduct was discriminatorily motivated. Therefore, the federal claims in this case must be dismissed, and this Court will decline to exercise supplemental jurisdiction over the remaining local and common law claims. As a result, Defendants' motions to dismiss Plaintiffs' complaint have been **GRANTED**, and Plaintiffs' complaint has been **DISMISSED**. The Court issued a separate order consistent with this Memorandum Opinion on September 30, 2018.

# I.    INTRODUCTION

## A.    Background[3]

During the eighteen months prior to Friday, November 18, 2016, Defendant WASA repeatedly attempted to repair a frail subsurface water main beneath Delafield Place, which is a street in the District of Columbia that is comprised predominantly of single-family row houses.  (*See* Am. Compl. ¶ 35–36.)  WASA's repair attempts were ultimately unsuccessful, as evidenced by the fact that, on November 18th, a "stream of concentrated water . . . bore into the adjacent underground sewage main by which WASA collects and carries untreated, raw sewage and household, commercial, and semi-industrial waste from the homes," (*id.* ¶ 26), and within minutes, raw sewage began to erupt from the toilets at the basement level of the houses on Delafield Place (*id.* ¶ 38).  By the end of thirty minutes, the basement floors of Plaintiffs' homes were submerged beneath two to three feet of raw sewage, producing a stench that was "overwhelming and nauseating; the sight, terrifying."  (*Id.*)  And these circumstances rendered the amenities and fixtures in the basements of the affected homes—which generally included the washer and drier, the sole hot water heater, the furnace, and in some cases living spaces such as a bedroom or lounge—entirely inaccessible.  (*See id.* ¶ 39.)

WASA responded to the sewage release by immediately shutting off water and sewer access to Delafield Place.  (*See id.* ¶ 40.)  It further advised most, but not all, of the 21 citizens of the District of Columbia who owned the impacted homes, none of

---

[3] The facts recited in this opinion are gleaned from Plaintiffs' Amended Complaint, and this Court has treated the complaint's allegations as true for the purpose of resolving the instant motions to dismiss. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007).

whom were white (*see id.* ¶ 35), that WASA would handle the clean-up and would remediate their houses (*see id.* ¶ 42). WASA then contracted with Defendants Belfor, Servpro, and ServiceMaster (collectively, "Defendant Contractors") to perform the clean-up and remediation work. (*See id.* ¶ 43.) According to Plaintiffs, the ensuing steps that these companies took to clean up the sewage and remediate their residences were entirely unsatisfactory, and not only did Defendant Contractors fail to fix the significant damage that the sewage leak had caused, their intervention also led to a host of additional problems. (*See id.* ¶ 44 (asserting, *inter alia*, that the contractors tracked fecal matter into previously unaffected areas of the houses with no remedial clean-up; removed and disposed of owners' personal items without their knowledge or consent; removed tiling in at least three homes in a manner that resulted in friable asbestos exposure; they failed to remove all contaminated waste; and failed to restore the basement bathrooms to their original condition).) In short, Plaintiffs maintain that WASA exhibited "gross negligence and reckless disregard for Plaintiffs' health and property" from beginning to end (*id.* ¶ 1), and that instead of helping, the Defendant Contractors' clean-up and remediation effort actually "worsened the injury" (*id.* ¶ 2).

### B. Procedural History

By letter dated December 5, 2016, Plaintiffs served a Notice of Citizen Suit—a prerequisite to litigation under the citizen suit provisions of several federal environmental statutes—on WASA. (*See id.* ¶ 4 (referencing Section 7002 of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972; Sections 104, 112, and 310 of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9604, 9612, 9659; and Section 20 of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2619).) Then, on May 7, 2017,

Plaintiffs filed an eleven-count complaint in this Court against WASA. (*See* Compl., ECF No. 1.) Plaintiffs dropped one count and also added Belfor, Charmay, and ServiceMaster as defendants on August 24, 2017, when they amended the complaint. (*See* Am. Compl.).[4]

In Counts I through IV, Plaintiffs claim that Defendants' conduct violated various federal and state civil rights statutes. (*See* Am. Compl. ¶¶ 128–32 (Count I, Violation of Civil Rights (42 U.S.C. § 1981)); *id.* ¶¶ 133–37 (Count II, Violation of Civil Rights (42 U.S.C. § 1982)); *id.* ¶¶ 138–42 (Count III, Violation of Civil Rights (42 U.S.C. § 1983)); *id.* ¶¶ 143–50 (Count IV, Violation of Civil Rights (D.C. Human Rights Act)).) In Counts V through VIII, Plaintiffs contend that the events of November 18, 2016, and their aftermath, transgressed a host of federal and state environmental laws. (*See id.* ¶¶ 151–58 (Count V, Violation of Resource Conservation and Recovery Act: Citizens' Suit (42 U.S.C. § 6972(a)(1)(B))); *id.* ¶¶ 159–71 (Count VI, Comprehensive Environmental Resource Conservation and Liability Act Liability (42 U.S.C. § 9601)); *id.* ¶¶ 172–74 (Count VII, Violation of TSCA: Citizens' Suit (15 U.S.C. § 2619)); *id.* ¶¶ 175–81 (Count VIII, Violation of D.C. Asbestos Rules (D.C. Code § 111.01)).) Only Counts IX and X make the kinds of claims that are traditionally associated with a purportedly accidental and catastrophic event like the one at issue here. (*See id.* ¶¶ 182–94 (Count IX, Common-law Gross Negligence); ¶¶ 195–202 (Count X, Common-law Trespass).) Plaintiffs' complaint seeks relief in the form of compensatory damages, consequential damages, punitive damages, attorneys' fees and

---

[4] Plaintiffs' original complaint included a stand-alone count seeking declaratory relief (Count XI), which was omitted when the complaint was amended.

costs with interest, medical monitoring, and any other equitable and legal relief to the maximum extent permitted by law. (*See, e.g.*, *id.* at 28–29.)

As noted above, each of the Defendants has filed a separate motion to dismiss Plaintiffs' complaint. (*See* WASA's Mot.; ServiceMaster's Mot.; Belfor's Mot.; Servpro's Mot.) In general, Defendants assail the complaint on both procedural and substantive grounds, arguing, for example, that Plaintiffs have failed to comply with the statutory notice requirements of the environmental statutes they invoke, and that Plaintiffs have not alleged sufficiently that Defendants acted under color of state law or that they had discriminatory intent, as the civil rights statutes require. (*See, e.g.*, WASA's Mot. at 25–26, 30–34; *id.* at 18–21; Belfor's Mot. at 23–24.) Plaintiffs respond that Defendants' motions are meritless, because the procedural requirements of the various statutes were followed and the facts that are alleged in the complaint are more than sufficient to state a plausible claim for relief under federal and state law. (*See, e.g.*, Pls.' Opp'n at 10, 12, 17.) Defendants' motions became ripe for this Court's review on March 9, 2018. (*See* Reply Mem. in Supp. of Belfor's Mot., ECF No. 41; WASA's Reply to Pls.' Opp'n to WASA's Mot., ECF No. 42; Reply Mem. in Supp. of Servpro's Mot., ECF No. 43; Reply to Pls.' Opp'n to ServiceMaster's Mot., ECF No. 44.) This Court held a hearing on the motions on July 10, 2018.

## II.     LEGAL STANDARDS

### A.     Motions To Dismiss Under Rule 12(b)(6)

Motions to dismiss under Rule 12(b)(6) impugn the sufficiency of a complaint's allegations. Federal Rule of Civil Procedure 12(b)(6) specifically authorizes dismissal on the grounds that the complaint "fail[s] to state a claim upon which relief can be

granted[.]" Fed. R. Civ. P. 12(b)(6). Accordingly, a motion under Rule 12(b)(6) requires the Court to consider whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (explaining that the complaint's allegations must be sufficient to permit a "reasonable inference that the defendant is liable for the misconduct alleged" (internal quotation marks and citations omitted)).

In this regard, the court must confine its review to the four corners of the complaint, as well as any "documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies[,]" *Page v. Mancuso*, 999 F. Supp. 2d 269, 275 (D.D.C. 2013) (internal quotation marks and citation omitted), and "must accept as true all of the allegations contained in a complaint[,]" *Harris*, 791 F.3d at 68 (internal quotation marks and citation omitted). But this tenet "is inapplicable to legal conclusions." *Harris*, 791 F.3d at 68. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (alteration in original) (internal quotation marks and citation omitted). Additionally, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint." *Kowal v. MCI Comm'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

**B.      Supplemental Jurisdiction under 28 U.S.C. § 1367(c)(3)**

"Federal courts are courts of limited jurisdiction[,]" *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); as a general matter, the U.S. Constitution enumerates the limited categories of cases to which their judicial power may extend, *see*

Art. III, § 2.  The two most significant categories of original jurisdiction in the federal

courts are federal question jurisdiction and diversity jurisdiction, *see* 28 U.S.C. §§

1331–1332, but federal courts also possess supplemental jurisdiction over certain state

law claims that are anchored to claims over which federal original jurisdiction was

appropriate.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966)

(finding federal court jurisdiction to hear "state and federal claims [which] derive from

a common nucleus of operative fact").

Specifically, under 28 U.S.C. § 1367(a), if a district court has original

jurisdiction, it also has "supplemental jurisdiction over all other claims that are so

related to claims in the action within such original jurisdiction that they form part of the

same case or controversy under Article III of the United States Constitution."  28

U.S.C. § 1367(a).  Moreover, supplemental jurisdiction is subject to the district court's

discretion under 28 U.S.C. § 1367(c).  "[D]istrict courts may decline to exercise

supplemental jurisdiction" in certain specified circumstances, including if "the district

court has dismissed all claims over which it has original jurisdiction[.]"  28 U.S.C. §

1367(c).  While "[t]he exercise of supplemental jurisdiction remains discretionary on

the part of a federal court, [in] the usual case in which all federal-law claims are

dismissed before trial," courts have routinely found that "the balance of factors to be

considered under the [supplemental] jurisdiction doctrine—judicial economy,

convenience, fairness, and comity—will point toward declining to exercise jurisdiction

over the remaining state law claims." *Robinson–Reeder v. Am. Council on Educ.,* 532 F.

Supp. 2d 6, 18 (D.D.C. 2008) (quoting *Shekoyan v. Sibley Int'l*, 409 F.3d 414, 424 (D.C.

Cir. 2005)) (internal quotation marks and alterations omitted).

## III.   ANALYSIS

As explained above, Defendants make myriad arguments concerning the procedural and substantive deficiency of Plaintiffs' claims. For example, Defendants maintain that Plaintiffs' federal environmental law claims are procedurally barred because certain statutory notice requirements were not satisfied (*see* WASA's Mot. at 25–26, 30–34), and that the same environmental claims are also substantively insufficient, because the cited statutes do not address the type of harm that Plaintiffs allege (*see id.* at 27–29, 32–35). Defendants contend that Plaintiffs' federal civil rights claims are similarly substantively flawed, because Plaintiffs' allegations do not demonstrate that Defendants acted under color of state law (*see* Belfor's Mot. at 23–24) or had the requisite discriminatory intent (*see* WASA's Mot. at 18–21).  This Court generally agrees with Defendants' arguments, for the reasons explained fully below. Therefore, the Court has granted Defendants' Rule 12(b)(6) motions and has dismissed Plaintiffs' federal claims.  The remainder of Plaintiffs' complaint has been dismissed as well, because the Court declines to exercise supplemental jurisdiction over the remaining common law claims.

### A.   Plaintiffs' Federal Environmental Law Claims Are Dismissed Because Plaintiffs Did Not Satisfy The Statutory Pre-Suit Notice Requirements, And Because The Complaint Fails To State A Claim Under These Statutes In Any Event

In their Counts V, VI, and VII, Plaintiffs contend that Defendants' conduct violated provisions of the following federal statutes: the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972(a)(1)(B); the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9604, 9612, 9659; and the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2619. (*See* Am.

Compl. ¶ 4; *see also* Notice of Citizen Suit, Ex. 1 to Pls.' Opp'n, ECF No. 38-1, at 2.) Each of these three federal laws is "just one piece of a larger network of environmental laws and their regulations that work together to protect our nation's natural resources and public health." Envtl. Prot. Agency, *Introduction to: Other Laws That Interface with RCRA* 1 (1999).

Notably, these statutes are chiefly concerned with public safety and the protection of public resources; thus, section 7002(a)(1)(B) of the RCRA authorizes citizens to file suit against "any person . . . who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste *which may present an imminent and substantial endangerment to health or the environment*." 42 U.S.C. § 6972(a)(1)(B) (emphasis added). Similarly, through CERCLA, Congress "impose[d] strict liability for *environmental remediation*," *Lockheed Martin Corp. v. United States*, 833 F.3d 225, 227 (D.C. Cir. 2016) (emphasis added), upon "any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities . . . from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," 42 U.S.C. § 9607(a), and those subject to CERCLA are strictly liable for "(A) all costs of removal or remedial action incurred by the United States Government" and "(B) any other necessary costs of response incurred by any other person" *id.* §§ 9607(a)(4)(A)–(B), *see U.S. v. Atl. Research Corp.*, 551 U.S. 128, 131–32 (2007). The TSCA regulates primarily "man-made chemical substances[,]" *N.Y. Cmtys. for Change v. N.Y. City Dept. of Educ.*, No. 11cv3494, 2012 WL 7807955, at *4 (E.D.N.Y. Aug. 29, 2012), such as asbestos, and addresses circumstances where chemical

substances endanger public safety by presenting an "'unreasonable risk of injury to health or the environment[,]'" *id.* (quoting 15 U.S.C. § 2601(a)(2)). And its citizen suit provision imposes liability against persons, including government instrumentalities or agencies, that are "alleged to be in violation of this chapter or any rule promulgated under [certain sections of this statute]." 15 U.S.C. § 2619(a)(1).

In their motions, Defendants emphasize that Plaintiffs' suit is manifestly inconsistent with the public-safety purposes of these federal environmental statutes in two ways: first, because Plaintiffs did not provide pre-suit notice to the entities who would otherwise be responsible for addressing imminent risks to public health and safety, and second, because the allegations that Plaintiffs have made in the complaint do not involve the type of imminent or ongoing harm caused by release of a hazardous substance (as that term is defined by statute). Defendants' arguments in this regard are well-founded and persuasive.

      1.    <u>Plaintiffs Have Failed To Comply With The Procedural Notice Requirements Of The RCRA, CERCLA, and TSCA</u>

Plaintiffs rely on the citizen suit provisions of each of the three environmental statutes, *see* 42 U.S.C. § 6972; 42 U.S.C. § 9659; 15 U.S.C. § 2619, as the authority for litigating their claims in federal court. (*See* Am. Compl. ¶ 4.) But each of these provisions also has a notice mandate that requires any putative plaintiff to provide notice to a list of entities *prior* to commencing a civil action, including each alleged violator and various enforcement authorities. *See* 42 U.S.C. § 6972(b)(2)(A); 42 U.S.C. § 9659(d)(1); 15 U.S.C. § 2619(b)(1)(A). (*See also* WASA's Mot. at 25–26, 30–31, 33–34.)

For example, under section 6972(b)(2)(A) of the RCRA,

> [n]o action may be commenced under [the citizen suit provision] prior to ninety days after the plaintiff has given notice of the endangerment to—(i) the [EPA] Administrator [of the Environmental Protection Agency]; (ii) the State in which the alleged endangerment may occur; [and] (iii) any person alleged to have contributed or to be contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste referred to in [the citizen suit provision].

42 U.S.C. § 6972(b)(2)(A). The Supreme Court has held that satisfaction of the requirements of this provision is a mandatory procedural prerequisite to suit, and dismissal of the lawsuit is required if its terms are unmet. *See Hallstrom v. Tillamook County*, 493 U.S. 20, 31–32 (1989) (explaining that "[a]s a general rule, if an action is barred by the terms of a statute, it must be dismissed"). Likewise, the citizen suit provision of the CERCLA states that

> [n]o action may be commenced under subsection (a)(1) of this section before 60 days after the plaintiff has given notice of the violation to each of the following: (A) The President [of the United States;] (B) The State in which the alleged violation occurs[; and] (C) Any alleged violator of the standard, regulation, condition, requirement, or order concerned.

42 U.S.C. § 9659(d)(1). The citizen suit provision of the TSCA similarly specifies that "[n]o civil action may be commenced [. . .] before the expiration of 60 days after the plaintiff has given notice of such violation (i) to the [EPA] Administrator, and (ii) to the person who is alleged to have committed such violation." 15 U.S.C. § 2619(b); *see also Basel Action Network v. Mar. Admin.*, 370 F. Supp. 2d 57, 75–76 (D.D.C. 2005).

Plaintiffs insist that they complied with these notice provisions because they served a "Notice of Citizen Suit" on WASA on December 7, 2016, and also waited the specified length of time before filing the instant action. (*See* Pls.' Opp'n at 12.) But

none of the Defendant Contractors were included in Plaintiffs' written notice. (*See* Notice of Citizen Suit at 1–2.) Also notably absent were the EPA Administrator (for purposes of the RCRA and the TSCA) and the President (for purposes of CERCLA). (*See id.*) Plaintiffs contend that their notice to WASA was nevertheless sufficient under these environmental statutes, because Defendant Contractors were serving as *agents* of WASA, which was notified (*see* Pls' Opp'n at 13), and because the letter sent to WASA was addressed not only to WASA but also to "several executives" of the District of Columbia and EPA (*id.* at 12).

Plaintiffs are wrong on both fronts. As to Defendant Contractors, Plaintiffs' Notice fails to satisfy the plain language of the relevant statutory provisions, which quite clearly require that notice be provided to *each* alleged violator. *See, e.g.,* 42 U.S.C. § 6972(b)(2)(A)(iii) ("any person alleged"); 42 U.S.C. § 9659(d)(1)(C) ("[a]ny alleged violator"); 15 U.S.C. § 2619(b)(1)(A)(ii) ("to the person who is alleged to have committed such violation"). Because Plaintiffs have alleged that each Defendant Contractor violated these environmental laws, Plaintiffs cannot evade the mandatory notice requirements by asserting a theory of 'agency' that magically transforms Congress's clearly stated conception of personhood with respect to notice into a law that requires only that notice be provided only to the principal. To the contrary, the statutes make clear that "*any* alleged violator" must receive notice of an impending citizen suit, 42 U.S.C. § 9659(d)(1)(C) (emphasis added)—which means exactly what it says. And the purpose of these environmental laws further support a literal interpretation of this language; in the interest of protecting public safety, Congress clearly intended for each violator to have the opportunity to solve the problem and

thereby avoid being sued. *See* Randall S. Abate, *Rethinking Citizen Suits for Past Violations of Federal Environmental Laws: Recommendations for the Next Decade of Applying the Gwaltney Standard*, 16 Temp. Envtl. L. & Tech. J. 1, 6 (1997) (explaining that, in the context of environmental hazards, "Congress intended citizen suits to have a prospective focus and [to] play a supplementary role in relation to government enforcement efforts" (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 60–61 (1987))).

Thus, it is clear to this Court that the environmental statutes that Plaintiffs seek to vindicate are designed primarily to provide the appropriate enforcement authorities with the opportunity to address and rectify possible violations affecting public safety. *See Garcia v. Cecos Int'l, Inc.,* 761 F.2d 76, 82 (1st Cir. 1985) ("Notice from potential private plaintiffs gives the EPA and the state an opportunity to investigate the alleged violation."). As noted, the first order concern of these statutes is public safety, and when viewed against this backdrop, the notice requirement is key to "trigger[ing] administrative action to get the relief that [the citizen] might otherwise seek in the courts." 116 Cong. Rec. 32,927 (1970) (remarks of Sen. Muskie); *see also Gwaltney*, 484 U.S. at 59–60 (noting that another purpose of the notice requirement is to enable the violator to come into compliance and avoid litigation). Here, whether agents or not, Defendant Contractors were deprived of the opportunity to address the alleged violations, in contravention of the notice provisions' language as well as the citizen suit's broader regulatory purpose, and as a result, this Court easily concludes that Plaintiffs have not satisfied the procedural requirements of these statutes.

Nor did Plaintiffs successfully provide the statutorily required notice *to WASA*. To be sure, Plaintiffs *did* send WASA a letter it titled "Request for Emergency Relief and Notice of Citizen Suit," in which it cited to the various environmental laws and indicated Plaintiffs' intention to sue. (*See* Amend. Compl. ¶ 4*; see also* Notice of Citizen Suit at 2.) But this letter was deficient under the statutes insofar as it was not *also* addressed to the Administrator of the EPA and other relevant enforcement authorities. *See* 42 U.S.C. § 6972(b)(2)(A)(i) (providing that the responsible person *and* the Administrator *and* the State in which the alleged endangerment may occur must be notified); 42 U.S.C. § 9659(d)(1)(A) (the notice must go to "*each* of the following: [t]he President, [t]he State in which the alleged violation occurs, [a]ny alleged violator" (emphasis added)); 15 U.S.C. § 2619(b)(i) (the notice must go "(i) to the Administrator, *and* (ii) to the person who is alleged to have committed such violation" (emphasis added)); *cf. Garcia,* 761 F.2d at 82 ("[W]e would therefore dismiss suits where the complaint is filed less than sixty days after actual notice to the agency *and* the alleged violators.") (emphasis added). Again, because the citizen suit provisions of these environmental statutes are intended to "trigger administrative action," 116 Cong. Rec. 32,927 (1970) (remarks of Sen. Muskie), the EPA Administrator and the President must be noticed so that they can take action, as needed, in the exercise of their enforcement authority. *See* 42 U.S.C. §§ 2619(b)(i), 6972(b)(2)(A)(i), 9659(d)(1)(A).

The bottom line is this: for good reason, the three federal environmental statutes that Plaintiffs seek to invoke in their complaint contain clear and incontrovertible notice requirements that Plaintiffs have failed to satisfy in the context of the instant case. Thus, the environmental claims that Plaintiffs have brought against all of the

named Defendants must be dismissed for failure to state a claim upon which relief can be granted, on the grounds that these claims are procedurally barred. *See Hallstrom*, 493 U.S. at 31–32.[5]

> 2. The Cited Environmental Statutes Do Not Pertain To Sewage, And Plaintiffs' Allegations Do Not Establish An Imminent Or Ongoing Harm

Plaintiffs' federal environmental claims fail for an additional reason: because none of the statutes Plaintiffs rely on pertain to sewage, and in any event, the harm that Plaintiffs allege is not imminent or ongoing, these federal environmental statutes do not apply to the circumstances presented here.

> a. *Sewage Is Expressly Exempted From The "Solid And Hazardous Waste" That The RCRA And The CERCLA Address, And The TSCA Concerns Only Man-Made Chemical Substances*

As Defendants point out, the RCRA and CERCLA regulate responses to "hazardous waste," 42 U.S.C. § 6972(a)(1)(B), or "hazardous substances," *id.* § 9607(a), including what these statutes refer to as "solid waste," *id.* § 6903(5) ("[t]he term 'hazardous waste' means a solid waste, or combination of solid wastes, which […] pose a substantial present or potential hazard to human health or the environment when improperly […] managed"). The statutory definition of "solid waste" states:

> The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid,

---

[5] Defendant WASA has styled its motion with respect to the notice defect as one under Rule 12(b)(1) (*see* WASA's Mot. at 30–31), but the Supreme Court has left open the question of whether this particular defect is *jurisdictional* in nature, as opposed to merely procedural. *See Hallstrom*, 493 U.S. at 31 ("In light of our literal interpretation of the statutory requirement, we need not determine whether [the statutory notice provision] is jurisdictional in the strict sense of the term."). The D.C Circuit has not yet addressed the question, and the parties here have not specifically briefed this issue. This Court, too, concludes that it need not resolve the uncertainty, because Plaintiffs have failed to satisfy the statutory notice requirement, and thus their environmental claims must be dismissed in any event. *See id.* at 31–32.

semisolid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities, *but does not include solid or dissolved material in domestic sewage*, or solid or dissolved materials in irrigation return flows or industrial discharges which are point sources subject to permits under section 1342 of Title 33, or source, special nuclear, or byproduct material as defined by the Atomic Energy Act of 1954, as amended (68 Stat. 923) [42 U.S.C.A. § 2011 et seq.].

*Id.* § 6903(27) (emphasis added). This same provision defines the scope of coverage with respect to hazardous waste in regard to both the RCRA and CERCLA. *See id.* § 9601(29) (cross-referencing the RCRA provision and stating that "[t]he term[] . . . 'hazardous waste' . . . shall have the meaning provided in . . . 42 U.S.C. § 6903"). Moreover, the relevant regulations also expressly exclude domestic sewage. *See* 40 C.F.R. § 261.4(a)(1) (providing that "solid waste" as included in the definition of "hazardous waste" does *not* include "domestic sewage," which "means untreated sanitary wastes that pass through a sewer system").

Accordingly, it is clear beyond cavil that the RCRA and the CERCLA do not apply to the allegations regarding sewage that Plaintiffs make in the amended complaint. (*See* WASA's Mot. at 27–28, 32–33.) Nor does the TSCA, for that matter, because the TSCA is concerned with toxic man-made chemical substances like asbestos, and in any event, Plaintiffs have not stated the relevant chapter or rule promulgated under the TSCA which Defendants have allegedly violated, and such an allegation is required to bring a citizen suit. *See* 15 U.S.C. § 2619(a)(1).

Undaunted, Plaintiffs attempt to recast their claims and to argue that the statutory definition of "solid waste" is broad enough to circumvent the domestic sewage exclusion that is set forth in the regulations. (*See* Pls.' Opp'n, at 14 (arguing that "the statutory definition of 'solid waste' is broader, and the domestic sewage exclusion is

narrower, than the regulatory definition [so as to include] material resulting from industrial, commercial, mining, agricultural, and community operations" (internal quotation marks omitted)).) This effort is unavailing for several reasons, not the least of which is the fact that the very statutory provision that Plaintiffs rely upon *also* expressly excludes domestic sewage. *See* 42 U.S.C. § 6903(27) (stating that "hazardous waste" as used in the statute "does not include solid or dissolved material in domestic sewage"). Moreover, even if the scope of what is *included* in "solid waste" in the statutory definition is broader than the definition provided in the regulation (through its inclusion of industrial or commercial waste), that has no bearing on what is expressly *excluded* under the statute: "solid or dissolved material in domestic sewage." 42 U.S.C. § 6903(27). There is no meaningful difference between the "raw, untreated sewage" from nearby hospitals and other commercial facilities that Plaintiffs say spewed into their homes on November 18, 2016 (*see* Am. Compl. ¶¶ 1, 130), on the one hand, and the "domestic sewage" that this statute expressly excludes from the definition of "hazardous waste" and "solid waste," on the other. And to the extent that Plaintiffs are suggesting that the sewage alleged here is "industrial" or "commercial" and not purely "domestic" in nature (*see* Pls.' Opp'n, at 14–16), or that the origin and intended destination of the sludge prior to the rupture defeats any sewage exception (*id.* at 18), such allegations are insufficient to state a plausible claim under the terms of these statutes, which contemplate *both* pure domestic sewage from homes such as Plaintiffs' *and* other solid waste (e.g. commercial material) "dissolved [in] domestic" sewage, and *excludes them both*. 42 U.S.C. § 6903(27). The statutory provision on which Plaintiffs rely is also entirely unconcerned with the *route* of the sewage that the statutes exclude,

and on its face, the regulation's statement that solid waste "excludes mixture[s] of domestic sewage and other wastes that pass[] through a sewer system to a publicly owned treatment works for treatment," 40 C.F.R. § 261.4(a)(1), plainly applies to the circumstances alleged in Plaintiffs' complaint. Therefore, the Court finds Plaintiffs' argument untenable, and it rejects Plaintiffs' contention that their environmental claims can survive a motion to dismiss, when the statutes they rely upon, by their own plain terms, were enacted to protect the environment from spills and leaks of hazardous substances and not domestic sewage-line ruptures.

   b.    *Stating A Claim Under The RCRA, CERCLA, And TSCA Requires Allegations Of Imminent Or Ongoing Harm That The Complaint At Issue Here Does Not Include*

Even if the environmental statutes that Plaintiffs invoke could be read to cover the circumstances of the harm that Plaintiffs allege, their complaint is also devoid of any allegations of imminent or ongoing harm, and thus it fails to state a claim under these compliance-oriented laws. It is well established that, to make a claim under the RCRA, the plaintiff must demonstrate not only that the defendant contributed to the presence of "a solid or hazardous waste as defined by the RCRA" but also that such waste "present[s] an *imminent* and *substantial* endangerment to health or the environment[.]" *Foster v. United States*, 922 F. Supp. 642, 660 (D.D.C. 1996) (emphasis added) (citation omitted); *see also id.* at 662 (granting summary judgment for defendant when plaintiff's RCRA claim failed to demonstrate such imminent and substantial endangerment). "[A] finding of 'imminency' does not require a showing that actual harm will occur immediately," but "the risk of threatened harm must be present." *Basel Action*, 370 F. Supp. 2d at 78 (citation omitted). And, notably, this risk requires "more than a mere showing that solid or hazardous wastes are present at the

Site." *Foster*, 922 F. Supp. at 661. Instead, there must be "reasonable cause for concern that someone or something may be exposed to a risk of harm . . . if remedial action is not taken." *Id.* (internal quotation marks and citation omitted).

It is precisely because the RCRA is addressed to an imminent or ongoing risk of harm from the presence of hazardous waste that the remedy that the statute provides is limited to injunctive relief. *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 484, 488 (1996) (holding that the RCRA provides no right to money damages and that a plaintiff cannot recover "compensation for past cleanup efforts" but "could seek a mandatory injunction, *i.e.*, one that orders a responsible party to 'take action' by attending to the cleanup and proper disposal of toxic waste, or a prohibitory injunction, *i.e.*, one that 'restrains' a responsible party from further violating RCRA"). The TSCA similarly pertains to an imminent or ongoing hazard caused by the presence of toxic chemicals; thus, its remedial scope is also confined to injunctive relief. *See, e.g.*, *Brewer v. Ravan*, 680 F. Supp. 1176, 1184 (M.D. Tenn. 1988) (holding that no monetary penalties may be assessed under TSCA citizen suit); *Boone v. DuBose*, 718 F. Supp. 479, 484 (M.D. La. 1988) (explaining that the TSCA and RCRA do not "permit a private right of action for the recovery of compensatory damages"); *Adams v. Republic Steel Corp.*, 621 F. Supp. 370, 376 (W.D. Tenn. 1985) (holding that a private right of action for compensatory damages under TSCA fails to state a cause of action).

Like the RCRA and the TSCA, the CERCLA, too, has a prospective focus; it serves to "promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts [a]re born by those responsible for the contamination." *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009) (internal

quotation marks and citation omitted). But certain monetary damages are available under the CERCLA—plaintiffs can seek reimbursement for past clean-ups in the specific and limited circumstance in which the prior expenditure was a "necessary cost" that is "not inconsistent with the national contingency plan[.]" 42 U.S.C. §§ 9607(a)(4)(A)–(B); *see also Foster*, 922 F. Supp. at 652 (finding that, under CERCLA, a non-state plaintiff must demonstrate that her costs were both necessary and consistent with the national contingency plan).[6] Therefore, CERCLA can be a vehicle for compensatory relief, but not in the form of unspecified damages for general harms caused by past exposure to hazardous waste; rather, plaintiffs can seek specific reimbursements for past clean-up costs that the plaintiff has incurred if the national contingency plan contemplates such expenses.

Here, Plaintiffs seek compensatory and injunctive relief based on factual allegations that do not demonstrate the kind of ongoing and imminent harm that these environmental statutes are designed to address. With respect to Plaintiffs' claim for compensatory damages, Plaintiffs have failed to specify any clean-up costs they have incurred, much less plausibly allege that they made "necessary" expenditures that are consistent with the national contingency plan for the purpose of the CERCLA. And absent such allegations, compensatory relief under CERCLA is unavailable. *See Key Tronic Corp. v. United States*, 511 U.S. 809, 821 (1994) (finding that certain "services do not constitute 'necessary costs of response' and [therefore] not recoverable under

---

[6] *See Carson Harbor Vill. v. Cnty. of Los Angeles*, 433 F.3d 1260, 1265 (9th Cir. 2006) ("Private party remedial action is consistent with the [National Contingency Plan] if the action, when evaluated as a whole, is in *substantial compliance* with [certain procedural requirements], and results in a CERCLA-quality cleanup." (emphasis in original) (internal quotation marks omitted) (citing 40 C.F.R. § 300.700(c)(3)(i)); *see also id.* at 1266 (adding that "the National Contingency Plan requires that the party seeking recovery provide an opportunity for public comment and participation, conduct a remedial site investigation, and prepare a feasibility study" (citation omitted)).

CERCLA"); *see also Foster*, 922 F. Supp. at 652 (where "plaintiff fails to demonstrate that his past [response] costs were necessary and consistent with the NCP he is not entitled to recover them").

The remaining dispute concerns whether or not Plaintiffs' complaint plausibly claims an entitlement to injunctive relief under the cited environmental statutes. (*Compare* Belfor's Mot. at 31, 42 *with* Am. Comp. ¶ 157; Pls.' Opp'n at 16, 20.) This Court concludes that Plaintiffs' complaint fails in this respect as well. First of all, the allegations of Plaintiffs' amended complaint vividly describe a sewage-main rupture and allegedly insufficient follow-on remediation efforts *that have already taken place*, and Plaintiffs' pleading appears primarily concerned with seeking compensation for the considerable damage that these past events have caused. (*See, e.g.*, Amend. Compl., at 36 (requesting that the Court order Defendants to "disgorge or reimburse Plaintiffs, and each of them, all costs incurred by Plaintiffs proximately caused by Defendants['] violation of RCRA, including attorneys' fees and costs incurred in connection with this action"); *id.* at 39 (requesting that the Court order Defendants to "pay or reimburse to Plaintiffs, and each of them, all costs and damages proximately caused by Defendants' conduct [and] . . . such other and further equitable or legal relief [including] interest, costs, and attorneys' fees"); *id.* at 40 (same).) The complaint does not allege that the disastrous sewage-line rupture is an ongoing occurrence, nor does it contain facts that might give rise to a plausible inference that Plaintiffs face an imminent threat of another, similar hazardous-waste leak or spill. Thus, the complaint does not allege an ongoing or continuous injury for present purposes. *See, e.g.*, *Gwaltney*, 484 U.S. at 67 (finding that, under a citizen suit provision using nearly identical language, citizens

could not seek injunctive relief for wholly past violations); *Meghrig*, 516 U.S. at 484 (clarifying that the appropriate forms of relief include enjoining the violator to "take action" or "restrain" from further violations).

What is more, it is clear to this Court that Plaintiffs are not seeking the type of remedial relief that the RCRA, the CERCLA, or the TSCA actually authorizes. For example, although the complaint requests that Defendants be enjoined "to address the contamination that they ha[ve] caused" (Amend. Compl., at 36), Plaintiffs cite no cases that interpret these particular statutes as authorizing courts to enjoin defendants to remediate the effects of past injurious conduct in the manner that Plaintiffs suggest. (*See, e.g.*, *id.* (seeking an order that requires Defendants "to address the contamination that they ha[ve] caused, and which continues to subject the residents of Delafield Place to substantial and imminent harm, including by arranging and paying for the medical monitoring of all those, including Plaintiffs, affected by WASA's conduct and WASA's hazardous waste").) Indeed, an injunction that requires a defendant to remedy the harm that the defendant's past actions have caused is an injunction in name only—i.e., it is the functional equivalent of ordering compensatory damages, which means that such an "injunction" is not properly viewed as injunctive relief at all.

Plaintiffs' attempt to sidestep this conclusion by recasting their environmental claims as requests for prospective relief in the form of "medical monitoring" demonstrates a fundamental misunderstanding of these federal environmental laws and the nature of the remedy they provide. Again, these statutes permit citizens who have provided the relevant authorities with the requisite notice to seek an injunction to address an *imminent* or *ongoing* harmful act (the leak or spill of hazardous waste), 42

U.S.C. § 6972(a)(1)(B), and they are generally *not* the vehicle by which a plaintiff who has been damaged by exposure to such a spill or leak seeks to remedy its residual effects. Put colloquially, what is done is done, and an injunction ordered more than 60 or 90 days after the leak at issue (in accordance with the statutes' notice requirements) can only prevent the impact of an ongoing or future exposure; it cannot blunt a hazardous waste leak that has already occurred. Thus, the thrust of these particular statutes is to empower citizens to go to court to seek injunctive relief to *stop* or *prevent* continuous or ongoing spills or leaks that the authorities have not yet addressed, and they simply are not concerned with providing compensation or other remedial relief for the potential lingering effects of past injurious conduct of this nature, however warranted.

Because Plaintiffs' environmental law claims and related allegations ignore the subtle, but significant, distinction between an ongoing and continuous hazardous waste leak or risk, on the one hand, and the potentially lasting effects of past exposure to such waste, on the other, they fail to state a claim upon which relief can be granted. Thus, even if (1) these environmental statutes pertained to sewage, and (2) Plaintiffs had satisfied the statutory notice requirements, and (3) one accepts as true the complaints' allegations regarding the lingering harmful effects of the sewage-main rupture that occurred on November 18, 2016, Plaintiffs' complaint cannot proceed with respect to these claims, because it contains no factual allegations from which one could infer that an ongoing leak or imminent risk of such leak exists at present, such that injunctive relief to prevent future harm is warranted. Consequently, Counts V, VI, and VII must be dismissed.

**B.** **Plaintiffs' Federal Civil Rights Claims Must Be Dismissed Because The Complaint's Allegations Do Not State A Claim Under These Statutes**

In Counts I, II, and III, Plaintiffs claim that Defendants' conduct violated three federal civil rights statutes: 42 U.S.C. §§ 1981, 1982, and 1983. Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens," 42 U.S.C. § 1981, and "to establish a claim under § 1981, a plaintiff must show that (1) [he or she is a member] of a racial minority [group]; (2) the defendant had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute[,]" *Mitchell v. DCX, Inc.*, 274 F. Supp. 2d 33, 44–45 (D.D.C. 2003) (internal quotation marks and citation omitted) (alterations in original); *see also Davis v. Megabus Northeast LLC*, No. 16-0939, 2018 WL 1471947 at *2 (D.D.C. Mar. 26, 2018) (noting that Section 1981 "most commonly involve[s] contracts of employment," but the provision "also prohibits refusal of service based on race" (quoting *Mitchell*, 274 F. Supp. 2d at 44)). Section 1982 guarantees that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]" *Id.* § 1983.

Notably, as a practical matter and for the purpose of the instant lawsuit, these three claims effectively reduce to one—a discrimination claim brought under Section 1983—because there is no stand-alone private cause of action under Sections 1981 and 1982, as Defendants point out. (*See* Belfor's Mot. at 20–22.) That is, it is well established that Section 1983 is the remedial mechanism that plaintiffs invoke to vindicate the rights enumerated in all three of these statutory provisions. *See, e.g.*, *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 731 (1989) ("Congress intended that the explicit remedial provisions of § 1983 be controlling in the context of damages actions brought against state actors alleging violation of the rights declared in § 1981."); *Victors v. Kronmiller*, 553 F. Supp. 2d 533, 543 (D. Md. 2008) ("*Jett*'s reasoning applies equally well to § 1982 suits against state actors."); *see also Chandler v. Jones*, 802 F. Supp. 2d 13, 14 n.1 (D.D.C. 2011). Therefore, the only civil rights claim whose elements this Court needs to consider for the purpose of the pending motions to dismiss is Plaintiffs' Section 1983 claim, which alleges, in essence, that Defendants violated the protections of Sections 1981 or 1982 while acting under color of state law.[7] A violation of any one of these underlying anti-discrimination laws requires a showing of

---

[7] Plaintiffs fashion the complaint's allegations of race discrimination in Counts I and II as arising under Sections 1981 and 1982, and the Amended Complaint makes an independent, cursory reference to the Equal Protection Clause. (*See* Am. Compl. ¶ 45, ¶¶ 140–41.) The requirement of discriminatory intent applies whether Plaintiffs bring a Section 1981 claim or a 1982 claim *or* a claim under the Equal Protection clause. *See, e.g.*, *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (explaining that "'[p]roof of discriminatory intent or purpose is required' to show" an equal protection violation (quoting *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)); *Ekwem v. Fenty*, 666 F. Supp. 2d 71, 79 (D.D.C. 2009) ("Plaintiff has therefore failed to allege any facts plausibly indicating 'discriminatory intent or purpose,' and has not established the required elements of an equal protection claim.").

discriminatory intent; therefore, that same requirement applies to a Section 1983 claim to remedy a violation under one of these laws. This means that, here, this Court need concern itself only with Defendants' contention that Plaintiffs have failed to allege facts that, if true, would establish that Defendants were acting under color of state law and that they had the requisite discriminatory intent, and thus have failed to state a claim under 42 U.S.C. § 1983. (*See* WASA's Mot., at 18–24.) For the reasons explained below, this Court agrees with this contention.

      1.    <u>Plaintiffs Have Not Alleged Facts That Support The Conclusion That Defendants Were Acting Under Color Of State Law</u>

"To state a claim under [Section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *see also Hoai v. Vo,* 935 F.2d 308, 312 (D.C. Cir. 1991) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150 (1970)); *Gonzaga Univ. v. Doe,* 536 U.S. 273, 279 (2002) (noting "that § 1983 actions may be brought against state actors to enforce rights created by federal statutes as well as by the Constitution"). The alleged wrongdoer must "have exercised power possessed by virtue of state law and made possible only . . . [through] the authority of state law." *Atkins*, 487 U.S. at 49 (internal quotation marks and citation omitted); *see also Amiri v. Gelman Mgmt. Co.*, 734 F. Supp. 2d 1, 3 (D.D.C. 2010) (dismissing Section 1983 claim for failure to state a claim where complaint fails to suggest that defendant was a state actor or acted in concert with the District of Columbia); *Amiri v. Kelting,* 356 Fed. Appx. 423 (D.C. Cir. 2009) (affirming dismissal of the complaint where plaintiff Amiri "alleged no conduct by a state actor within the purview of 42 U.S.C. § 1983"); *Md. Minority Contractors*

*Ass'n v. Lynch,* 203 F.3d 821 (4th Cir. 2000) (table) (affirming dismissal of a Section 1983 claim against a private company where the complaint did not allege that the company was extensively regulated by the state or that the company otherwise was a state actor). Section 1983's prescription that the defendant must be acting "under color of state law" expressly applies to the District of Columbia. *See* 42 U.S.C. § 1983 (listing "any State or Territory or the District of Columbia").

Plaintiffs allege that WASA was acting under color of state law within the meaning of Section 1983, simply and solely because WASA is an "independent agency" of the District of Columbia. (Am. Compl. ¶ 26 (internal quotation marks omitted).) But the mere fact that WASA is a state agency (even if true) does not establish that WASA was acting under color of state law when it allegedly violated Plaintiffs' civil rights. Rather, the law is clear that the "under color of state law" mandate requires the state actor to have committed the alleged violation *pursuant to* a state custom or policy. *See Feirson v. District of Columbia,* 506 F.3d 1063, 1066 (D.C. Cir. 2007) (clarifying that Section 1983 liability requires a plaintiff to show not only that a state actor committed the alleged violation "but also that the District's custom or policy caused the violation" (internal punctuation and citation omitted)); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978) (stating that Section 1983 makes unlawful an action that "execut[es] a government's policy or custom"). Put another way, because a state actor's discriminatory conduct might well have been motivated by the actor's own individual animus, "[p]roof of a single incident of unconstitutional activity is insufficient to impose liability" under Section 1983 "unless there [i]s proof that there was a *policy* in place that was unconstitutional." *Sanders v. District of Columbia,* 522 F.

Supp. 2d 83, 88 (D.D.C. 2007) (emphasis added) (citing *Monell*, 436 U.S. at 694); *see also Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981) ("Section 1983 will not support a claim based on a *respondeat superior* theory of liability.").

Plaintiffs' complaint contains a "single conclusory statement[,]"*Ekwem v. Fenty*, 666 F. Supp. 2d 71, 79 (D.D.C. 2009) (internal quotation marks and citation omitted)), to the effect that WASA was a state actor (Am. Compl. ¶¶ 140–41), and offers "'*no* facts to support [any] claim that the District has a racially discriminatory policy or practice[.]'" *Ekwem* at 79 (emphasis in original) (citation omitted). Thus, it plainly fails to state a Section 1983 claim. *See Sanders*, 522 F. Supp. 2d at 88. Plaintiffs' Section 1983 claims against the Defendant Contractors fail for this same reason, although it is perhaps even more clear that the complaint's "under color of state law" contentions are deficient with respect to these defendants, because Defendant Contractors are themselves private corporations. (*See* Am. Compl. ¶¶ 27–29; Belfor's Mot. at 23–24.) The only grounds Plaintiffs offer for claiming that these federal civil rights laws apply to such actors by virtue of Section 1983 is the allegation that these companies were acting as "agents" of WASA (Am. Compl. ¶ 44), but it has long been clear that the acts of private contractors "do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *See Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982); *see also Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982) ("[T]he [private] party charged with the deprivation [of a federal right] must be a person who may fairly be said to be a state actor [which] may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to

the State.").  In any event, Defendant Contractors' purported status as "agents" of the

District (i.e., state actors) puts them in no different position with respect to Section

1983's "under color of state law" requirement than an entity that unquestionably

qualifies as a state actor for Section 1983 purposes; regardless, a viable Section 1983

claim must rest on allegations that the defendant *acted* under color of state law—i.e.,

pursuant to a state custom or policy.  *See Turner v. Corrs. Corp. of Am.*, 56 F. Supp. 3d

32, 35–36 (D.D.C. 2014) (explaining that "suits against companies that perform

services usually performed by the municipality . . . also require[] proof of custom or

policy" and the contention "that a municipal policy was the moving force behind the

constitutional violation" (internal citations and quotation marks omitted)).  Plaintiffs'

complaint alleges no such thing.

2.    Plaintiffs Have Not Alleged Facts From Which Discriminatory
      Intent Can Plausibly Be Inferred

Even if Plaintiffs' complaint sufficiently alleges that Defendants were acting

under color of state law when they engaged in conduct that violated Plaintiffs'

protected civil rights, the rights at issue here—i.e., those protected by 42 U.S.C. §§

1981 or 1982, or the Equal Protection Clause—"can be violated only by purposeful

discrimination," *Gen. Bldg. Contractors Ass'n v. Penn.*, 458 U.S. 375, 391 (1982), and

Plaintiffs' complaint is devoid of any allegations that can give rise to a reasonable

inference of discriminatory intent.  *See Atherton v. District of Columbia Office of*

*Mayor*, 567 F.3d 672, 681, 688 (D.C. Cir. 2009) (reversing district court's finding that

plaintiff stated a discrimination claim under Section 1983 where "spare facts and

allegations [were] not enough" to show "that the defendant acted with discriminatory

purpose"); *see also Middlebrooks v. Godwin Corp.,* 722 F. Supp. 2d 82, 87–88 (D.D.C.

2010) (dismissing Section 1981 claim where "[t]he only suggestion that plaintiff's race or color played any role in her interactions with [defendants] are [her] conclusory statements that she was 'terminated . . .based on [her] race' and 'color'"); *McKnight v. Middleton*, 699 F. Supp. 2d 507, 530–31 (E.D.N.Y. 2010) (dismissing claims under Sections 1981 and 1982 because plaintiff "failed to plead any non-speculative facts supporting an inference of racial animus, let alone intentional discrimination"); *McReynolds v. Sodexho Marriott Servs., Inc.*, 349 F. Supp. 2d 1, 7 n.3 (D.D.C. 2004) ("Defendant correctly argues that plaintiffs cannot bring a disparate impact claim under 42 U.S.C. § 1981, since purposeful discrimination is required under § 1981."). Plaintiffs "concede that the Amended Complaint does not contain any allegation of *overt* discrimination" but argue allege nevertheless that "the sewage disaster affected a community that is *wholly African-American*," and on that basis alone, Defendants' conduct gives rise to a civil rights claim.  (*See* Pls.' Opp'n at 10 (emphasis added) (asserting that Defendants' conduct "denied an all-African-American community its most basic human and civil rights"); *id.* at 9–10 (suggesting that the "suspicious sequence of events" surrounding the sewage-main break and its aftermath had a "racially-discriminatory impact unexplainable on grounds other than race" (internal quotation marks omitted)).)

Plaintiffs' suggestion that the Delafield Place residents' race alone is sufficient to support an inference of race discrimination is woefully mistaken. (*See* Mots. Hr'g Tr., ECF No. 45, at 21:8–18 (insisting that the mere fact that this community "[i]s entirely African American and received the treatment that it did" permits an inference of discrimination).)  The only allegation in the complaint that has anything whatsoever

to do with the Plaintiffs' claim of discrimination on the basis of race is the mere fact that the Plaintiffs themselves are uniformly African American. (*See* Am. Compl. ¶ 9.) A legion of cases has held that the mere fact that an injured party happens to be a member of a certain racial minority group does not give rise to a reasonable inference of discriminatory treatment, and this principle is too well established to warrant explanation here. It suffices to say that, in 2018, the suggestion by Plaintiffs' counsel that the race of his clients, standing alone, without any other facts, is a sufficient basis upon which to draw an inference that Plaintiffs were mistreated because of their race, borders on ineffective assistance. *See Ndondji v. Interpark Inc.*, 768 F. Supp. 2d 263, 274–75 (D.D.C. 2011) (observing that "[Plaintiff's] occasional reference to his race in his amended complaint is. . . insufficient to make out a section 1981 action," and noting that he could have done more, such as "identif[ying] the races of the InterPark employees who allegedly discriminated against him or, more importantly, the races of other similarly situated employees who were allegedly treated more favorably than he was"). Indeed, the complaint says *nothing* about Defendants' intentions with respect to the sewage main break, and the botched clean-up, much less that these events occurred as alleged because the impacted residents were non-white, and in fact, the words "discrimination" and "discriminatory" are wholly absent from the allegations that Plaintiffs make concerning alleged civil rights violations.

To recap, it is clear beyond cavil that "[a] plaintiff cannot merely invoke his race in the course of a claim's narrative and automatically be entitled to pursue relief" under the civil rights statutes that Plaintiffs have relied upon in this case. *Middlebrooks*, 722 F. Supp. 2d at 88 (internal quotation marks and citations omitted). "Rather, [the]

plaintiff must allege *some* facts that demonstrate that his race was the reason for [the] defendant's actions." *Id*. (emphasis added) (internal quotation marks and citations omitted). And having failed to allege any such facts in the instant complaint, Plaintiffs here are not entitled to pursue Counts I, II, and III—i.e., their claims under Sections 1981, 1982, and 1983.

C. **Because There Are No Remaining Federal Claims, The Court Declines To Exercise Supplemental Jurisdiction Over Plaintiffs' D.C. Local Claims**

The only claims over which this Court has original jurisdiction in this case are the federal environmental claims raised in Counts V, VI, and VII, and the federal civil rights claims raised in Counts I, II, and III. (*See id.* ¶ 31.) For the reasons explained above, this Court has concluded that all of these claims must be dismissed; therefore, it has proceeded to determine whether or not to exercise supplemental jurisdiction over the four remaining (local) claims that Plaintiffs raise in Count IV (discrimination under the DCHRA), Count VIII (violation of the D.C. Asbestos Rules), Count IX (common law gross negligence) and Count X (trespass). *See Shekoyan v. Sibley Intern.*, 409 F.3d 414, 423 (D.C. Cir. 2005) (explaining that the district court alone must decide "[w]hether to retain jurisdiction over [supplemental] state and common law claims after the dismissal of the federal claims"). The Court has discretion to exercise supplemental jurisdiction. *See United Mine Workers*, 383 U.S. at 726.

It is a common practice of the judges in this district to decline to exercise supplemental jurisdiction over local matters if the federal claims over which the court has original jurisdiction are dismissed. *See, e.g.*, *Byrd v. District of Columbia*, 297 F. Supp. 2d 136, 143 (D.D.C. 2003) ("[T]he Court will grant summary judgment as to both defendants on plaintiff's claims under § 1983[,] . . . and the Court declines to exercise

its supplemental jurisdiction over the remaining common-law claims[.]"); *Caesar v. Rosstead*, 593 F. Supp. 2d 91, 94 (D.D.C. 2009) ("declin[ing] to exercise supplemental jurisdiction . . . [and] conclud[ing] that [the Court] lacks subject matter jurisdiction over plaintiff's common law tort claims"); *Jackson v. Ponds*, 534 F. Supp. 2d 29, 32 (D.D.C. 2008) ("Plaintiff fails to state a civil rights claim upon which relief can be granted, and with the dismissal of this federal claim, the Court dismisses his contract and tort claims[.]"). This Court sees no reason to deviate from this practice in the instant case; therefore, it has dismissed Counts IV, VIII, IX, and X of Plaintiffs' complaint.

## IV.    CONCLUSION

This Court has no doubt that Plaintiffs have suffered tremendously as a result of the sewage-line rupture that damaged their homes and ruined their personal property, and while the law might ultimately afford them some relief, Plaintiffs must seek such damages pursuant to statutes that actually pertain to the harms they are alleging, and must do so in accordance with the procedures prescribed by those laws. For the reasons stated above, the allegations of Plaintiffs' complaint do not state a claim upon which relief can be granted under federal law. And this Court has declined to exercise supplemental jurisdiction over the myriad claims that Plaintiffs have brought under state law, including the common law negligence claims that ordinarily permit recovery of damages for the harms of this type. Consequently, and as set forth in the Order dated

September 30, 2018, Defendants' motions to dismiss Plaintiffs' complaint has been

**GRANTED**, and Plaintiffs' complaint has been **DISMISSED**.

DATE:  October 2, 2018                                 *Ketanji Brown Jackson*
                                                       KETANJI BROWN JACKSON
                                                       United States District Judge